**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

**SOUTHWEST MATERIALS INC** | **CASE NO. 2:24-CV-01441**

**JUDGE JAMES D. CAIN, JR.**

**MAGISTRATE JUDGE LEBLANC**

# MEMORANDUM RULING

Before the court is a Motion for Summary Judgment [doc. 28] filed by limitation plaintiff Southwest Materials Inc. ("Southwest"). Claimant Gerald Miller opposes the motion. Doc. 38. Claimant Louisiana Workers Compensation Corp. adopts Miller's opposition. Doc. 40.

## I.
## BACKGROUND

This limitation of liability suit arises from injuries suffered by Gerald Miller while working on a materials barge owned and operated by Southwest on April 21, 2024, at the Port Aggregates, Inc. ("PAI") facility in Calcasieu Parish, Louisiana. Miller filed an admiralty claim and third-party complaint against Southwest as his employer and PAI as his borrowing employer, alleging that he was entitled to damages as a Jones Act seaman injured aboard a vessel. Doc. 12. Limitation plaintiff Southwest now brings this motion for summary judgment, asserting that Miller does not qualify as a Jones Act seaman and that his claims for Jones Act negligence, unseaworthiness, maintenance and cure, and punitive

damages must be dismissed. Miller and the Louisiana Workers Compensation Corp. oppose the motion. Docs. 38, 40.

## II.
## SUMMARY JUDGMENT STANDARD

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). He may meet his burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The non-moving party is then required to go beyond the pleadings and show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To this end he must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material

fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## III.
## LAW & APPLICATION

The Jones Act provides remedies in tort law for a seaman who is injured in the course of his employment. Land-based maritime employees, on the other hand, are limited to worker's compensation under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901, et seq. *In re Two-J Ranch, Inc.*, 534 F.Supp.2d 671, 677 (W.D. La. 2008). The Jones Act and the LHWCA are mutually exclusive compensation regimes. *Harbor Tug and Barge Co. v. Papai*, 520 U.S. 548, 553 (1997).

To qualify as a seaman under the Jones Act a plaintiff must satisfy two requirements: (1) his duties must contribute to the function of the vessel or the accomplishment of its mission, and (2) he must have a connection to a vessel in navigation (or an identifiable group of vessels) that is substantial both in duration and nature. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995). "To satisfy the first prong of the *Chandri*s test, the claimant need only show that he 'do[es] the ship's work.'" *In re Endeavour Marine, Inc.*, 234 F.3d 287, 290 (5th Cir. 2000). This requirement is very broad. *Id.* The purpose of the second prong is to "separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore, whose employment does not regularly expose them to the perils of the sea." *Id.* The second "substantial connection" requirement

involves consideration of both the duration and nature of an individual's employment, which is a much more involved inquiry. *Id.* As the Supreme Court has stated:

> the total circumstances of an individual's employment must be weighed to determine whether he had a sufficient relationship to the navigation of vessels and the perils attendant thereon. The duration of a worker's connection to a vessel and the nature of the worker's activities, taken together, determine whether a maritime employee is a seaman because the ultimate inquiry is whether the worker in question is a member of the vessel's crew or simply a land-based employee who happens to be working on the vessel at a given time.

*Chandris*, 515 U.S. at 370 (citation omitted). To establish a sufficient temporal connection to meet the duration requirement, a plaintiff must show that he spends at least 30 percent of his time in service of a vessel or an identifiable group of vessels. *Roberts v. Cardinal Services, Inc.*, 266 F.3d 368, 374–75 (5th Cir. 2001).

The U.S. Fifth Circuit Court of Appeals recently provided three additional factors that this court must consider in determining whether the "substantial connection" requirement has been met to qualify as a seaman and derive benefits under the Jones Act. *Sanchez v. Smart Fabricators of Texas, Inc.*, 997 F.3d 564 (5th Cir. 2021). The court overruled its prior opinion in *Naquin v. Elevating Boats, LLC*, 744 F.3d 927 (5th Cir. 2014), emphasizing that the "perils of sea" test is only a consideration and should not be the sole or primary test. *Id.* at 573. Instead, courts must consider the following additional factors:

> (1) Does the worker owe his allegiance to the vessel, rather than simply to a shoreside employer?
> (2) Is the work sea-based or does it involve seagoing activity? and
> (3) (a) Is the worker's assignment to a vessel limited to performance of a discrete task after which the worker's connection to the vessel ends, or (b) Does the worker's assignment include sailing with the vessel from port to port or location to location?

*Id.*

Miller pled that he "was working as a Jones Act seaman aboard the SMI-101, a materials barge owned, operated, and/or controlled by [PAI] and/or [Southwest], at all pertinent times hereto, which was a vessel in navigation." Doc. 12, ¶ IV. Southwest provides unloading services for barges carrying construction materials at distinct locations in southwest Louisiana. Doc. 28, att. 3, pp. 31–33. It owns and operates three spud barges to carry out its operation, the SMI-101, SMI-103, and the SMI 107. *Id.* at 13. Southwest operates with a single crew, which receives instruction from land-based superintendent Chad Alcock. Doc. 28, att. 4, p. 80. At the time of the accident, Miller worked for Southwest as supervisor of this crew. Doc. 28, att. 4, pp. 35–36, 137–38.

The crew's assignment to any of the three barges depends on the job and customer, varying from day to day. Doc. 28, att. 3, pp. 31–35. The SMI-101 services PAI and Prairie Construction, at Bayou d'Inde in Westlake, Louisiana, and occasionally out of PAI's facility in Mermentau, Louisiana. *Id.* at 32–35; doc. 28, att. 4, pp. 63–64. Regardless of location, Southwest's barges function as stationary, shoreside work platforms from which material is transferred to land-based vehicles. Doc. 28, att. 3, pp. 48, 99; doc. 28, att. 4, pp. 62–63. They are spudded down about twenty-five feet from shore and remain stationary during the unloading process. Doc. 28, att. 4, pp. 90–91, 183. The barges have no self-propulsion, navigational lighting, rudder or steering controls, or crew quarters. *Id.* at 125. The only motor aboard is a small combustion engineer to power the hopper equipment. *Id.* When a Southwest barge is traveling a short distance between customer locations, portions of the crew (including Miller) will regularly ride along on the barge. *Id.* at 127–28; doc.

28, att. 5, p. 38. The crew does no work during this time, however, and the barge instead has its own deckhands to assist in navigation. Doc. 28, att. 5, pp. 39–40.

Upon arrival of the product barge, Miller's crew directs its positioning by hand or voice signal and then ties it off for unloading—but the product barges are propelled by third parties with their own captains and crews. *Id.* at 72–74; doc. 128, att. 5, pp. 37–38. Apart from telling the tug captain when the crew is ready to move or stop and how they want the product positioned, Miller does not instruct the tug captain on how to navigate or operate his vessel. Doc. 28, att. 4, pp. 114–15; doc. 28, att. 3, p. 70. However, the Southwest crew uses its own ropes to tie up barges and moves product barges with a track hoe as they are emptied. Doc. 38, att. 6, pp. 48–49. Miller described his crew's core function at any job site as getting product unloaded. Doc. 28, att. 4, p. 111. At the end of each shift, he leaves the barge and drives home. *Id.* at 93. He has never slept aboard the Southwest barges, which do not contain sleeping quarters. *Id.* at 142–43.

Miller was injured on April 21, 2024. He arrived at the worksite around 6:00 that morning and inspected the barge to make sure it was ready to begin work. Doc. 28, att. 4, pp. 94, 155, 253. About fifteen minutes later, while walking on the deck, he tripped on hydraulic hoses that ran along the deck surface. *Id.* at 180, 219–20. Miller points to evidence that the SMI-101 was poorly maintained, with numerous waste holes in the decking. Doc. 38, att. 3, pp. 20, 40. Miller also emphasizes that only one of the two spuds on the SMI-101 was operational at the time of his accident, meaning that the barge was poorly secured and would rock back and forth when it was meant to be stationary. *See* doc. 38, att. 1, pp. 281–83; doc. 38, att. 6, pp. 19–21.

The facts in this matter are similar to three recent cases rejecting Jones Act status under *Chandris* and *Sanchez*. In *Meaux v. Cooper Consolidated, LLC*, the plaintiff worked as a flagger and utility man as borrowed employee of Cooper, which loads and unloads vessels moored in the Mississippi River. The court initially granted summary judgment on seaman status, taking note of the "separation from the safety of land, even if not all that far, taken together with the fact that all of Meaux's work was performed aboard vessels midstream in a dangerous river[.]" *Meaux v. Cooper Consol., LLC*, 545 F.Supp.3d 383, 388 (E.D. La. 2021) (ASHE, J.). After a bench trial, however, the court reconsidered its ruling and determined that Meaux was not a seaman. *Meaux v. Cooper Consol., LLC*, 601 F.Supp.3d 38, 42 (E.D. La. 2022). Even though Meaux's work was done midstream, the court determined, boarding a crew boat and performing longshore work near or around water did not qualify as seagoing activity under *Sanchez*. *Id.* at 54. "Otherwise, scores of maritime workers would be transformed into Jones Act seamen who the law currently does not recognize as such." *Id.*

In *Rutherford v. Pontchartrain Materials Corp., LLC*, 732 F.Supp.3d 536 (E.D. La. 2024) (ASHE, J.), the defendant owned and operated three spud barges that it used in conjunction with material handling. *Id.* at 539. During unloading, its barges were spudded down or tied to shore and connected to land by a gangplank. *Id.* For short trips Pontchartrain employees also occasionally rode on the spud barges. *Id.* The plaintiff was a loader, who was primarily assigned to one of the spud barges. *Id.* During unloading, he would work on the third-party-owned material barges to signal crane operators or move materials with a front-end loader. *Id.* He also assisted in moving the material barge, including tying it to the

shore. *Id.* at 540. He was injured while aboard one of the material barges, when he was knocked into the water by the bucket of an excavator. *Id.* Judge Ashe granted summary judgment for the defendant on seaman status, finding that the matter "[did] not present as close of a call as did *Meaux*." *Id.* at 546. To this end he noted that Rutherford "nearly always worked on vessels that were only a gangplank away from shore," that the material barges were almost always located near shore during his work, and that "he never worked on any vessel while it was in motion." *Id.*

Meanwhile, in *Bouton v. Manson Construction Company*, 705 F.Supp.3d 622 (W.D. La. 2023) (JOSEPH, J.), the plaintiff worked as a laborer on a spudded-down platform at a dock demolition and construction project. *Id.* at 626. He contended that he also worked aboard several vessels owned or leased by Manson, and that his duties included piloting a skiff, traveling with a transport barge, and other vessel-related tasks. *Id.* The court rejected the notion that Bouton owed his allegiance to a vessel, however. It observed that he was not assigned to any particular vessel and "only occasionally boarded a tugboat to move the position of the barges . . . [;] these tasks were part and parcel with [his] discrete job responsibilities in assisting with the demolition of the old dock." *Id.* at 633. It further concluded that Bouton's work was not seagoing, because his duties on the barges were accomplished while they were spudded down or tied off close to shore. *Id.* at 628.

In contrast, Miller relies on *Cole v. Oceaneering International*, 681 F.Supp.3d 658 (E.D. La. 2023). There the court reconsidered its prior ruling and granted summary judgment to a crane operator, finding that he established a sufficient connection to his vessel to qualify as a seaman. *Id.* As the court noted, however, and in contrast to Miller,

Cole worked aboard a vessel in navigation (operating in the Gulf of America) and slept aboard that vessel. *Id.* at 687. Defendant did not challenge Cole's assertion that his work was sea-based, as he assisted with the vessel's projects including "underwater salvage operations, platform and stub removal, remotely operated underwater vehicle and diving support services, pipeline riser and subsea work, platform jacket repairs and other offshore subsea and surface inspection, maintenance, repair, and installation operations." *Id.* Furthermore, Cole slept aboard the vessel for the entirety of its hitches. *Id.* at 574. Accordingly, he made a much stronger case under all three of the *Sanchez* factors.

As these cases illustrate, it is usually the nature of the work rather than the proximity to water that separates a seaman from a longshoreman. Under *Chandris*, as explained above, the claimant must show that (1) his duties must contribute to the function of the vessel or the accomplishment of its mission, and (2) he must have a connection to a vessel in navigation (or an identifiable group of vessels) that is substantial both in duration and nature. 515 U.S. at 368 (1995). Under the first prong, a vessel includes "any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular time." *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 497 (2005). Accordingly, a spud barge that is still moved regularly (even if only over short distances) qualifies as a vessel. *Ducote v. V. Keeler & Co., Inc.*, 953 F.2d 1000, 1004 (5th Cir. 1992). The court focuses its inquiry on the substantial prong, under which it must consider:

> (1) Does the worker owe his allegiance to the vessel, rather than simply to a shoreside employer?
> (2) Is the work sea-based or does it involve seagoing activity? and
> (3) (a) Is the worker's assignment to a vessel limited to performance of a discrete task after which the worker's connection to the vessel ends, or (b)

> Does the worker's assignment include sailing with the vessel from port to port or location to location?

*Sanchez*, 997 F.3d at 573.

Here, as in *Rutherford*, Miller is not a Jones Act seaman even if he satisfies the other prongs because he does not engage in sea-based or seagoing activity. 732 F.Supp.3d at 546. Although he was sometimes transported on the barge, his actual work was accomplished while it was stationary. His evidence that the barge was not as securely spudded as it could have been, and that the platform would shift slightly with wind or currents, cannot convert a platform to a vessel in navigation. His duties aboard that structure, which related chiefly to unloading moored material barges, were "decidedly not sea-based." *Bouton*, 705 F.Supp.3d at 633. While Miller took a limited role in positioning the materials barge, this was only done in service of unloading the vessels—the role of a longshoreman, not a seaman. As the courts emphasized in *Rutherford* and *Bouton*, Miller remained a short distance from shore. And as in these cases and *Meaux*, he did not sleep aboard the vessel. Accordingly, the vessel served as a stationary platform during the time Miller was actually working aboard it and its involvement in this matter does not transform Miller into a seaman.

## IV.
## Conclusion

For the reasons stated above, the Motion for Summary Judgment [doc. 28] will be **GRANTED** and Miller's claims for Jones Act negligence, unseaworthiness, maintenance and cure, and punitive damages will be dismissed.

**THUS DONE AND SIGNED** in Chambers on the 14th day of August, 2026.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**